**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **MARVEL THOMPSON,** | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) |
| | ) No. 11 C 3454 |
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| Respondent. | ) |
| | ) |
| | ) |

## MEMORANDUM OPINION AND ORDER

In February 2005, a grand jury returned a 49-count indictment against 46 defendants, including Marvel Thompson ("Thompson"), stemming from their involvement in the Black Disciples drug-distribution network. On March 29, 2005, Thompson pleaded guilty to conspiracy to possess and distribute drugs. Subsequently, I sentenced him to 540 months in prison, a sentence affirmed by the Seventh Circuit. *See United States v. White*, 582 F.3d 787, 795–99 (7th Cir. 2009). On May 24, 2011, Thompson filed this Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255. For the reasons stated, the motion is denied.

I.

**A. Thompson's Claims**

In his initial *pro se* § 2255 motion, Thompson asserted that his sentence must be vacated because: (1) the government breached plea agreements that it made with him; (2) his constitutional

rights were violated by the drastic increase between the sentence of 108-135 months that he expected to receive, and the 540-month sentence imposed; (3) the government "sandbagged" him into pleading guilty and did not move to correct certain errors during Thompson's plea colloquy; and (4) he received ineffective assistance of counsel at the time he pleaded guilty, at sentencing, and on appeal. (Dkt. No. 1.)  On June 10, 2011, Thompson filed a supplement elaborating on his claim of ineffective assistance. (Dkt. No. 4.)  Subsequently, Thompson obtained counsel, who sought and was granted leave to file an amended memorandum in support of his motion.  That memorandum incorporated Thompson's previous filings and included a new twist: that associates of Thompson's cooperated with the government in exchange for the government's agreement that it would seek a sentence of about 10 years in prison for Thompson.  (Dkt. No. 23.)  Thompson was a third-party beneficiary of these agreements, which the government breached, Thompson contends.  He also contends that his attorney at sentencing and on appeal should have raised this argument. Thompson has included affidavits from the two associates supporting this argument.

**B.  Thompson's Plea Hearing**

When Thompson appeared for his change-of-plea hearing on March 29, 2005, it was unclear whether he would enter a blind plea or enter into a written plea agreement.  (Tr. of Change of Plea

Hearing ("COP Hr'g") 3.) After a recess, Thompson informed me that he wanted to plead guilty, but did not want to plead guilty to all of the offenses spelled out in the plea agreement. (*Id.* at 9–10.) Rather, he only wanted to plead guilty to certain narcotics transactions involving co-defendants Donnell Jehan and Kenyatta Coates. (*Id.* at 22.) He likewise refused to acknowledge that he was at one time the king of the Black Disciples gang.[1] (*Id.*) Thompson entered a blind plea, with the relevant portions of the plea colloquy set forth below.

Under oath, Thompson said he was 36 years old, married, and had finished the eleventh or twelfth grade. (*Id.* at 7.) He had no difficulty reading or writing. (*Id.*) He was employed as a record producer and the owner of a construction company and restaurant. (*Id.*) He had not taken any medication or drugs in the last 24 hours, was in good physical health, and had no mental health issues. (*Id.* at 8.)

Initially, Thompson said that he had not had enough time to speak with his attorney, Mr. Jack Friedlander. When I said I would delay the change of plea hearing so he could do so, Thompson

---

[1] As the Seventh Circuit explained in its ruling affirming Thompson's sentence, the "king" served as the leader of the gang and was responsible for developing gang policy and overseeing drug-trafficking operations. *White*, 582 F.3d at 794. Evidence presented at sentencing showed that Thompson was the sole king of the Black Disciples from the 1990s until 2003, when the gang shifted to a three-king leadership structure. *Id.* He then served as one of the three kings. *Id.* at 794–95.

3

backtracked, saying "I had enough time to understand exactly what I'm dealing with." (*Id.* at 10-11.) Mr. Friedlander explained that he had spent some 100 hours consulting with Thompson and explaining the nature of the government's conspiracy charge. (*Id.* at 13.) Thompson said that he wanted to go ahead with the plea, and was satisfied with his attorney's advice. (*Id.* at 14.)

In response to my questioning, Thompson confirmed that he had read the superseding indictment, had discussed it with Mr. Friedlander, and understood the charges against him. (*Id.* at 14-15.) He said that he understood he had a right to trial by jury, a right to appointed counsel if he could not afford an attorney, and the right to plead not guilty. (*Id.* at 15.) Thompson affirmed that he knew he had a right to a speedy trial, to confront and cross-examine the witnesses against him, and the right to use the court's subpoena power to obtain the attendance of witnesses. (*Id.* at 16.) He said that he understood the presumption of innocence, the burden of proof, his right to testify, and the fact that no inference of guilt could be drawn from his failure to testify. (*Id.*)

Thompson said that he understood his right to a jury trial, or to a bench trial if all parties and the court agreed. (*Id.*) He understood his right to help select the jury, that a jury would have to consider each count of the indictment separately and reach a unanimous verdict, and that the verdict would have to be

determined beyond a reasonable doubt. (*Id.* at 17.) He understood that if he was found guilty, he would have the right to appeal. (*Id.*) Thompson said he understood that he was giving up all of these rights by pleading guilty. (*Id.*)

The government then explained that the maximum statutory penalty was life in prison, with a mandatory minimum of at least 10 years in prison, a maximum fine of up to $4 million, and a term of supervised release of not less than five years up to and including life. (*Id.* at 18.) Thompson said that he understood the possible sentence. (*Id.*) I then asked him whether anyone had forced him to plead guilty, threatened him to cause him to plead guilty, or made any promises to cause him to plead guilty. (*Id.*) Thompson replied "no" to all of these questions, and said the decision to plead guilty was voluntary. (*Id.*) He said he understood that I would make the final decision as to what sentence he would receive. (*Id.* at 19.)

The government then gave its factual basis for the plea, but Thompson indicated he was not willing to plead guilty to all the conduct outlined. (*Id.* at 19-22.) Rather, he admitted that he sold approximately 29 kilograms of powder cocaine and one kilogram of heroin during 2004 to gang members Jehan and Coates, knowing that they planned to resell the drugs. (*Id.* at 22-24.) Because Thompson did not agree that he was guilty of all the allegations in the superseding indictment, I expressed concern that Thompson

understood the effect of his guilty plea. (*Id.* at 27.) Mr. Friedlander explained that Thompson understood that he was entering a blind plea and that at sentencing the government would have to prove any additional acts attributable to him by a preponderance of the evidence. (*Id.*) Mr. Friedlander explained that Thompson understood that "the proactive work done by him and others for the government will have to be proven to Your Honor without any help of that being offered from the government." (*Id.*) Mr. Friedlander added:

> And when you ask me have I explained all this to him, yes, I have. I've explained it to him, to his family on more than ten occasions, so he understands it. It's just he is a defendant who wants to plead guilty to what he did.

(*Id.*)

Thompson agreed that he did understand this. (*Id.* at 28.) He then asked to see the indictment because the government had mentioned a shooting in its factual basis that was not in the indictment. (*Id.*) Mr. Friedlander explained that the indictment did not contain every act that Thompson allegedly committed, to which Thompson replied, "That's for sentencing, right?" (*Id.* at 29.) Mr. Friedlander affirmed that was correct. (*Id.*)

I then explained to Thompson that while he did not have to agree with the government's factual basis, he did need to know that if he pleaded guilty, the government would attempt to prove those acts at sentencing by a preponderance of the evidence, and that if it did so, I could consider those acts in imposing sentence. (*Id.*

at 29.)  Thompson acknowledged that he wanted to plead guilty, and
I accepted the plea.  (*Id.* at 31–32.)

**C. Thompson's Sentence, Appeal, and Subsequent Proceedings**

Thompson's presentence report put him in Criminal History
Category I, with an adjusted offense level of 46, meaning that the
advisory guideline sentence was life imprisonment.  *White*, 582 F.3d
at 795.  As noted, I imposed a sentence of 540 months in prison.
On appeal, Thompson argued that I committed several errors in the
application of certain guidelines enhancements.  The Seventh
Circuit rejected all of these arguments and affirmed Thompson's
sentence in all respects.  *See White*, 582 F.3d at 795–98.  In
particular, the Seventh Circuit affirmed my finding that Thompson
obstructed justice when he lied about his role as a king of the
gang and the degree to which he was involved in the gang's drug-
trafficking operations.  *Id.* at 796.

Following his sentencing, Thompson sought to recover $320,000
in cash and certain possessions seized by the government when he
was arrested in May 2004.  Although the indictment included a
forfeiture count, the government did not pursue forfeiture.  I held
that the money seized from Thompson could be used to satisfy the
$100,000 fine imposed in his criminal case and could be held by the
government to pay off Thompson's tax obligations.  The Seventh
Circuit affirmed.  *Thompson v. United States*, 431 F. App'x 491 (7th
Cir. 2011).  On appeal, Thompson argued that the IRS relinquished

7

its claim to the money because the prosecutor in his criminal case orally promised that he would forego forfeiture proceedings. *Id.* at 492-93. The Seventh Circuit rejected this argument, noting that it was inconsistent with Thompson's statements during his plea colloquy that no promises had been made to him to induce his guilty plea. *Id.* at 493.

II.

Under 28 U.S.C. § 2255, federal prisoners can challenge their conviction or sentence if either is based on an error that is "jurisdictional, constitutional, or is a fundamental defect which inherently results in a complete miscarriage of justice." *McCloud v. United States*, --- F. Supp. 2d ---, 2011 WL 91046, at *1 (N.D. Ill. Jan. 11, 2011) (quoting *Oliver v. United States,* 961 F.2d 1339, 1341 (7th Cir. 1992)). If I find that such an error infected the judgment or sentence, I must vacate it. *Id.*

Generally, claims that could have been raised on direct appeal, but were not, are procedurally defaulted and may not be raised on collateral review under § 2255 in the absence of cause and prejudice. *Estremera v. United States*, No. 09 C 6519, 2012 WL 707151, at *2 (N.D. Ill. March 2, 2012)(citing *Massaro v. United States,* 538 U.S. 500, 504 (2003)). Claims of ineffective assistance, however, may be raised for the first time on collateral review. *Id.*

I must grant an evidentiary hearing on a § 2255 petition if the petitioner alleges facts that, if proven, would entitle him to relief. *Id.* (citing *Koons v. United States,* 639 F.3d 348, 354 (7th Cir. 2011)). A § 2255 petition may be summarily dismissed if the record conclusively suggests that the petitioner is not entitled to relief, such as where the allegations are conclusory or inherently unreliable. *Barker v. United States*, 7 F.3d 629, 633 n.3 (7th Cir. 1993).

III.

As a preliminary matter, the government moves to strike Thompson's amended memorandum supporting his § 2255 petition and the two affidavits by Thompson's associates filed in support of it.

A one-year statute of limitations applies to § 2255 petitions, with the period running from the date the conviction became final. 28 U.S.C. § 2255(f)(1). In this case, Thompson's petition for a writ of certiorari was denied on June 1, 2010, and his § 2255 petition was timely filed on May 24, 2011. His counseled amended petition, however, was not filed until Sept. 21, 2011. That means that in order to be timely, this supplemental brief must relate back to the original pleading and be based on the same claims. *Mayle v. Felix,* 545 U.S. 644, 664 (2005); *see Rodriguez v. United States*, 286 F.3d 972, 980 (7th Cir. 2002) (noting that the Rules Governing § 2255 Petitions adopt by reference the Federal Rules of Civil Procedure).

Fed. R. Civ. P. 15(c)(1)(B) permits relation-back only if the claims in the supplemental filing "arose out of the conduct, transaction, or occurrence set out — or attempted to be set out —" in the original pleading. An amendment does not relate back if it "asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." *Mayle*, 545 U.S. at 650.

In his timely *pro se* filing, Thompson contends that he pleaded guilty to Count I only because the government orally agreed that if he did so, he would be facing a sentence of between 108 and 135 months in prison, and the government would abandon its forfeiture count.[2] Thompson also contends in his *pro se* filing that Ms. Andrea Gambino, the attorney who represented him at sentencing and on appeal, was ineffective because she was aware that Thompson had reached a plea agreement with the government, but failed to raise the issue during sentencing when the government sought to prove conduct that would enhance his sentence.

---

[2] Thompson contends in his initial petition that "[a]lthough a mandatory minimum of 10 years normally would apply," he had another agreement with the government that would have reduced his sentence further. (Pet'r's Pet. at 4 (Dkt. No. 1).) Thompson said he would elaborate on that agreement in sealed filings, but it is unclear to what alleged agreement he was referring. The only sealed filings subsequently filed involve the alleged agreements his associates made with the government.

The government argues that Thompson's contentions in his counseled memorandum that he was the beneficiary of agreements between the government and two of his associates, and that Ms. Gambino was ineffective for failing to raise this issue at sentencing and on appeal, are time-barred because they are based on distinct legal theories and facts. Thompson argues that the amended petition contains the same issues as his original filings, namely the breach of oral agreements that induced Thompson's guilty plea, and ineffective assistance of counsel.

The allegations in the amended petition are of the same type as those raised in Thompson's initial filing, and occurred during the same general time frame in 2004 and 2005. It is true that Thompson's initial filings did not contend that the government had made agreements with his associates, and Thompson's reference to sealed filings did not hint that he would be claiming to be a third-party beneficiary of agreements made with others. The alleged agreements with Thompson's associates, however, generally comport with the allegations in Thompson's initial filing that he had reached agreements with the government that assured him of a sentence of about 10 years in prison. Because the allegations in Thompson's counseled memorandum are similar in time and type to the allegations in his *pro se* pleading, the government's motion to strike is denied, and I will turn to the merits of Thompson's claims.

**A. Grounds One, Two and Three: Breach of Plea Agreement**

Although stated somewhat differently, Thompson essentially alleges in Grounds One, Two, and Three that the government induced his guilty plea by promising to return property and approximately $300,0000 seized from his apartment, and to seek a sentence of between 108 and 135 months in prison.

Due process requires that the government fulfill promises that induce a defendant to plead guilty. *See United States v. Traynoff*, 53 F.3d 168, 171 (7th Cir. 1995) (citing *Santabello v. New York*, 404 U.S. 257 (1971)).  In a declaration filed with his initial *pro se* pleading, Thompson contends that in the summer of 2004, he engaged in plea discussions with the government, in particular with then-Assistant United States Attorney Joe Alesia.[3] (Thompson Decl. ¶ 6 (Dkt. No. 5, Ex. A).)  A deal was tentatively reached that would provide him with a sentence of less than 10 years in prison. (*Id.*)

Subsequently, Mr. Friedlander visited Thompson in the Kenosha County jail and presented him with a written plea agreement that

_____

[3] Thompson's declarations are not notarized affidavits, but he has declared them to be true under penalty of perjury pursuant to 28 U.S.C. § 1746, which is a substitute for notarization.  *See United States v. Wellman*, 830 F.2d 1453, 1467 (7th Cir. 1987)(noting that under federal law, a declaration under penalty of perjury generally may be used in lieu of an oath before a notary).

would result in a 15-year sentence and forfeiture of his property. (*Id.* at ¶ 7.) Thompson refused to sign it because it did not comport with his previous agreement with Mr. Alesia and because it included conduct to which he was not prepared to plead guilty. (*Id.* at ¶ 8.) Thompson contends that he told Mr. Friedlander he would not plead guilty unless the government accepted his plea only to certain conduct, and only if the sentencing range was between 108 and 135 months. (*Id.* at ¶ 12.) As noted above, when Thompson came to court on March 29, 2005, he made it clear that he would not sign a written plea agreement. Thompson contends that during the recess in the plea hearing, he told Mr. Alesia and Mr. Friedlander that he would only plead guilty to certain conduct, and that it was his understanding that this conduct would result in a sentence of between 108 and 135 months in prison. (*Id.* at ¶ 21.) He contends Mr. Alesia agreed to those terms and agreed that the government would abandon its forfeiture count. (*Id.*) In another declaration submitted after the filing of his counseled brief, Thompson contends that during the recess Mr. Alesia agreed that instead of seeking a specific sentence for his cooperation and that of his associates, the government would file an "open departure motion" enabling the court to impose a sentence of less than 10 years in prison. (2d Thompson Decl. ¶ 17 (Dkt. No. 49-1).)

Two problems doom Thompson's argument that the government breached a plea agreement with him: (1) Thompson did not raise the

issue on direct appeal, so it is procedurally defaulted; and (2) any claim that he had reached oral plea agreements is belied by the plea colloquy.

In his direct appeal, Thompson never claimed that the government had breached oral plea agreements with him or any of his associates. Although represented by Ms. Gambino, Thompson attempted to file a *pro se* supplemental brief on appeal, and the Seventh Circuit denied his motion. (*See* Seventh Cir. Case No. 07-2086, Dkt. Nos. 55, 56.) It is worth noting that his *pro se* brief does not reference any alleged oral plea agreements with himself or his associates. He did argue that he was entitled to "specific performance," but only in the context of arguing that he should be held responsible only for those acts that he admitted during the plea colloquy.

Thompson argues that Ms. Gambino's ineffectiveness in raising the issue is cause to avoid procedural default, but even if it were, the claim fails. The existence of oral plea agreements, either with Thompson or with his associates, is implausible in light of the record in this case. Thompson acknowledged during the plea colloquy that he understood he was facing a maximum of life in prison. He heard the prosecutor explain that he would try to increase Thompson's sentence by proving additional facts at sentencing in relation to drug quantities, Thompson's role in the offense, firearms, and other factors. He heard that his sentence

14

would ultimately be determined by me. Thompson was given considerable leeway to speak during the hearing, but he never explained that he (or any of his associates) had plea agreements with the government. In fact, he denied on the record that any promises had been made to induce his guilty plea.

While Thompson now contends that he did not understand "promises" to encompass oral agreements or understandings, this argument is frivolous. Thompson represented himself to be the owner of various businesses. He was the head of a sophisticated drug conspiracy. He cannot seriously argue that he did not understand the significance of this question. It is well-established that a petitioner cannot prevail on a claim that depends on his having lied during the plea colloquy. *See United States v. Peterson,* 414 F.3d 825, 827 (7th Cir. 2005) ("[A] motion that can succeed only if the defendant committed perjury at the plea proceedings may be rejected out of hand unless the defendant has a compelling explanation for the contradiction."). Here, Thompson does not offer a compelling explanation for his failure to mention the existence of alleged oral plea agreements at the plea colloquy. *See Mejia v. United States*, 740 F. Supp. 2d 426, 429 (S.D.N.Y. 2010) (rejecting without a hearing petitioner's argument that he had an undisclosed oral plea agreement because it was contradicted by petitioner's own testimony at the plea colloquy).

The fact that alleged oral agreements were made with Thompson's associates, rather than Thompson himself, does not aid him. During the plea colloquy, Mr. Friedlander explained that Thompson understood "that the proactive work done by him and others for the government will have to be proven to Your Honor without any help of that being proved from the government." (COP Hr'g at 27.) After hearing this, and all the other admonishments outlined above, Thompson chose to enter a blind plea of guilty. He cannot carry his burden to show the existence of any oral plea agreements, so this claim is denied.

**B.  Grounds Two and Three: Thompson's Contention that His Plea was not Knowing, Intelligent, or Voluntary**

In Grounds Two and Three, Thompson argues that the government "sandbagged" him into pleading guilty and failed to correct obvious errors that rendered his plea infirm. This claim fails for the same reason as his claim of undisclosed plea agreements: it is belied by the record.

When a challenge is made to the adequacy of a plea colloquy in a §2255 petition, the inquiry is confined to whether the plea was counseled and voluntary. *United States v. Broce*, 488 U.S. 563, 569 (1989). Thompson's plea was both. Thompson affirmed that he was satisfied with Mr. Friedlander's efforts, that he understood the charges he was facing, and that he wanted to plead guilty. Again,

16

these statements are presumed to be truthful. *See Bridgeman v. United States,* 229 F.3d 589, 592 (7th Cir. 2000).

Thompson now attempts to cast doubt on whether he understood the nature of the conspiracy charge and argues that he believed that by pleading guilty only to certain offenses, he could be held responsible only for those crimes. But Thompson stated under oath that he understood he was facing life imprisonment, that the government would attempt to prove additional offenses at sentencing by a preponderance of the evidence, and that no promises had been made to induce him to plead guilty. The Seventh Circuit has held that the only way a judge may determine whether a plea is knowingly and voluntarily made is by "observ[ing] the defendant's demeanor and responses to the court's questions and . . . rely[ing] on the defendant's sworn answers." *United States v. Walker*, 447 F.3d 999, 1004-05 (7th Cir. 2006). Based on my observations of Thompson, confirmed by a review of the transcript of the change of plea hearing, I am convinced that he knowingly and voluntarily entered into the guilty plea.

Thompson complains in part that I failed to advise him as to the sentencing range. But I was not required to do so. *United States v. Alvarez-Quiroga*, 901 F.2d 1433, 1435-36 (7th Cir. 1990); *see United States v. Barnes*, 83 F.3d 934, 939 (7th Cir. 1996) ("Defendants in many criminal cases can enter into valid plea agreements, and district courts can enforce them, without the

parties' knowing in advance exactly what sentence the court will impose."). Further, the Seventh Circuit has held that the fact that a defendant underestimates his sentence when pleading guilty is not a basis for withdrawing a guilty plea. *United States v. Gilliam*, 255 F.3d 428, 434 (7th Cir. 2001). As such, it can hardly be a basis for obtaining collateral relief, particularly where the pre-sentence report recommended a sentence far longer than 135 months in prison and yet Thompson never attempted to withdraw his plea. Thompson places great emphasis on the fact that I accepted his plea "as stated," but all that means is that the government was required to prove additional facts at sentencing, something that was repeatedly explained during the change of plea hearing. (*See* COP Hr'g 3–4, 25–26, 27, 29.)

Finally, to the extent Thompson argues that the factual basis for his plea was insufficient, this argument is both procedurally defaulted and meritless. *See Galbraith v. United States*, 313 F.3d 1001, 1006 (7th Cir. 2002). Thompson admitted during the plea colloquy that he was a member of the Black Disciples, that he bought and sold powder cocaine and heroin with Jehan and Coates, and that he knew they were going to resell it. He acknowledged that he conspired with these individuals to sell drugs. This was a sufficient factual basis for his plea of guilty.

**C. Ground Four: Ineffective Assistance of Counsel**

Thompson alleges that both Mr. Friedlander and Ms. Gambino provided ineffective assistance of counsel. Thompson has the burden of showing that counsel committed unprofessional errors, and that but for those errors, the outcome of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 694 (1984). In making this determination, I must view counsel's conduct in the context of the case as a whole, and with a strong presumption that decisions by counsel fall within a wide range of reasonableness. *United States v. Lindsay*, 157 F.3d 532, 534–35 (7th Cir. 1998). Further, to demonstrate prejudice, the petitioner must show a reasonable probability that but for counsel's errors, the result at sentencing would have been different. *Id.*

As to Mr. Friedlander, Thompson argues he was ineffective for failing to advise the court of Thompson's belief that his sentence would be limited by the conduct he admitted in the plea colloquy, and for failing to advise the court that Thompson did not understand the nature of the conspiracy to which he was pleading guilty. These arguments are unavailing for all the reasons outlined above in regard to the thoroughness of the plea colloquy. In light of this, Thompson could not have suffered prejudice.

Thompson points to one portion of the change of plea hearing, in which Mr. Friedlander explained that he had met with Thompson on numerous occasions.

> I think the issue is what the defendant considers a
> conspiracy to be, what the government and the law
> consider a conspiracy to be, and how the two of them
> intertwine. I spent numerous time drawing circles,
> expressing my feelings with regard to the law and telling
> him how he would fit into a conspiracy, how he would not,
> what a blind plea would be, what the plea agreement would
> be. . . . Mr. Thompson's understanding of what a
> conspiracy is based on the filing by the government and
> what the law's theory is are two different things. He
> acknowledges that he did commit certain acts. He
> acknowledges that he did do certain things. But I don't
> know that I can tell him any more than I have told him in
> the almost some 100 hours that I've been with him.

(COP Hr'g at 13–14.)

Without any citation to authority, Thompson argues in his counseled brief that Mr. Friedlander was ineffective for advising Thompson to enter into an open plea when he knew that Thompson's understanding of a conspiracy was different from that of the government. This argument ignores the fact that following Mr. Friedlander's comments, I explained Count I of the superseding indictment and confirmed that Thompson had read it and discussed it with his attorney. Further, it is clear from a review of the transcript of the change of plea hearing that Thompson was concerned about the wide-ranging nature of the conspiracy, and refused to admit responsibility for the actions of other factions of the gang. This is a far cry from not understanding the nature of the charges against him, and indeed Thompson acknowledged during the change of plea hearing that "I understand the nature of the charges, and I'm accepting my responsibility of those regardless of what I'm saying." (COP Hr'g at 11.)

Mr. Friedlander, in an affidavit, avers that he discussed with Thompson the conspiracy charges, all relevant conduct, and its potential impact on sentencing. (Friedlander Aff. ¶ 8 (Dkt. No. 39-1).) He avers that there is no question in his mind that Thompson understood to what crime he was pleading guilty and what the effects of that plea could be at sentencing. (*Id.* at ¶ 9.) Mr. Friedlander's affidavit is strongly supported by the record, and Thompson's self-serving statements otherwise are insufficient to create a question as to either prong of *Strickland*. *See Berkey v. United States*, 318 F.3d 768, 773 (7th Cir. 2003). Consequently, his ineffective assistance claim against Mr. Friedlander fails.

As to Ms. Gambino, Thompson claims she was ineffective for failing to raise the issue of the alleged oral plea agreements with Thompson and his associates at sentencing or on appeal; that she failed to send Thompson his file upon request, and that she had an undisclosed conflict of interest because she had previously been the subject of an investigation by the U.S. Attorney's Office.

In a signed declaration[4], Ms. Gambino asserts that she knew that Thompson's associates had cooperated on his behalf in the hopes of obtaining a lighter sentence for him, but she had no factual or legal basis for asserting that promises were made to

---

[4] Like Thompson's declarations, Gambino's statement is not notarized, but she has declared that it is true under penalty of perjury pursuant to 28 U.S.C. § 1746.

either of Thompson's associates. (Gambino Decl. ¶¶ 15-19 (Dkt. No. 39-2).) The government was unwilling to credit any cooperation on Thompson's behalf because he was unwilling to admit facts the government believed to be true, Ms. Gambino asserts. (*Id.* at ¶ 17.) This comports with Mr. Friedlander's statement at the change of plea hearing that any work done by Thompson and others would have to be proven without the government's help. It also comports with Thompson's own statement, under oath, that no promises had been made to induce him to plead guilty.

Thompson contends that his associates' affidavits necessitate an evidentiary hearing, but I disagree. No hearing is required if the allegations in the motion are incredible or the factual matters raised by motion may be resolved on the record before the district court. *Oliver v. United States*, 961 F.2d 1339, 1343 (7th Cir. 1992). Thompson's own testimony under oath and his own filings in the Seventh Circuit undermine any contention that these alleged oral agreements existed, or that Ms. Gambino was ineffective for failing to raise them. Thompson's additional claims of ineffectiveness in regard to Ms. Gambino are undeveloped — Thompson fails to explain how he was prejudiced by Ms. Gambino's alleged failure to turn over his file, for example — and meritless.

Thompson's allegation that Ms. Gambino labored under a conflict of interest is similarly meritless. Although it is true that Ms. Gambino was at one time the subject of an investigation by

the U.S. Attorney's Office, *see LaFuente v. United States*, 617 F.3d 944 (7th Cir. 2010), those events predated Ms. Gambino's representation of Thompson by several years. There is nothing to indicate that this incident had any effect on Ms. Gambino's representation of Thompson. For all of these reasons, Thompson's claim of ineffective assistance of counsel is denied.

IV.

When denying a § 2255 petition, I must determine whether to issue a certificate of appealability. Rule 11(a), Rules Governing Section 2255 Proceedings for the United States District Courts. To be entitled to a certificate of appealability, the petitioner must make "a substantial showing of the denial of a constitutional right." *Slack v. McDaniel,* 529 U.S. 473, 483 (2000). This requires a showing that reasonable jurists would find my resolution of the constitutional claims to be debatable or wrong. *Id.* at 484. Thompson has failed to make a substantial showing as to any of his claims, so I decline to issue a certificate of appealability.

V.

For the reasons stated, the government's Motion to Strike Pleadings [40] is denied. Thompson's Motion to Vacate, Set Aside or Correct Sentence [1] is likewise denied, and I decline to issue a certificate of appealability.

ENTER ORDER:

_____
**Elaine E. Bucklo**
United States District Judge

Dated: June 18, 2012